# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JEFFREY L. HINEMAN,

    Petitioner,

v.                                         Case No. 24-CV-415

MICHAEL GIERACH,

    Respondent.

## DECISION AND ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

Jeffrey L. Hineman, a prisoner in Wisconsin custody, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Hineman was convicted of first-degree sexual assault of a child under the age of 13. (Habeas Petition at 1, Docket # 1.) He was sentenced to 25 years, consisting of 17 years of initial confinement followed by eight years of extended supervision. (Docket # 1-1 at 1.) Hineman alleges that his conviction and sentence are unconstitutional. For the reasons stated below, the petition for writ of habeas corpus is granted.

## BACKGROUND

Following a jury trial, Hineman was convicted in Racine County Case No. 2015CF1159 with first-degree sexual assault of a child under the age of thirteen. The victim, S.J.S., was born in 2008. *State v. Hineman*, 2023 WI 1, ¶ 4, 405 Wis. 2d 233, 240, 983 N.W.2d 652, 656. Hineman was involved in a romantic relationship with S.J.S.'s mother from shortly before S.J.S.'s birth until June 2009. *Id.* Hineman was not S.J.S.'s biological father; however, he continued to maintain contact with S.J.S. until he and his mother moved away in September 2009. *Id.* S.J.S.'s mother eventually lost custody of him, and the

child moved in with his biological father, F.S. *Id.* In 2013, Hineman contacted S.J.S.'s grandmother (the mother of F.S.), requesting to reestablish contact with S.J.S. because Hineman cared for S.J.S. and wanted to be a part of his life. *Id.* Both F.S. and the grandmother agreed, after which Hineman had regular contact with S.J.S. *Id.* Hineman would spend time with S.J.S. at F.S.'s home, would buy gifts for S.J.S., and would take him out for activities such as shopping or going to the park. *Id.*

On March 12, 2015, Child Protective Services ("CPS") received a mandatory report from S.J.S.'s therapist. *Id.* ¶ 5. S.J.S. had been seeing the therapist to address behavioral issues such as pulling his pants down in class and at home and acting as if he was going to defecate on the floor. *Id.* The therapist reported that during school, S.J.S. was observed sucking on his pen cap and told a classmate that it "feels good when someone sucks on your privates." *Id.* S.J.S. initially told his therapist he learned this from a Garfield book or movie, but later indicated that Hineman had told him. *Id.* The CPS report states that "Reporter indicated that no information was given by [S.J.S.] that [Hineman] had touched him or forced [S.J.S.] to touch [Hineman]." *Id.* The therapist reported that she told F.S. and the grandmother about her concerns, and they were no longer permitting Hineman to have contact with S.J.S. *Id.*

CPS received a second report on April 20, 2015, from a nurse at Aurora Healthcare. *Id.* ¶ 6. The nurse reported that S.J.S.'s behavioral issues persisted. *Id.* She spoke with F.S. and the grandmother and reported they "feel that someone must be abusing [S.J.S.] since his

2

behavior is getting worse." *Id.* The nurse also reported that F.S. and the grandmother believed either Hineman or "an autistic son, whose name is not known" abused S.J.S. *Id.*

CPS received a third report on May 29, 2015, from both a teacher and a counselor at S.J.S.'s school. *Id.* ¶ 7. The CPS report states, "Both reporters feel the concerns today for [S.J.S.] are his continuation of defiant behaviors at school resulting from what is believed to be sexual[ ] abuse by a former family friend." *Id.* The teacher and counselor reported their concerns were based on observations of S.J.S.'s behavior at school as well as conversations with S.J.S.'s family. *Id.*

On June 5, 2015, the Racine County Sheriff's Office received a copy of the March 12 CPS report. *Id.* ¶ 8. The sheriff's office never received either the April 20 or May 29 CPS reports. *Id.* Investigator Tracy Hintz was assigned to the case and began her investigation by reviewing the March 12 CPS report. *Id.* ¶ 9. She summarized the CPS report's contents in a police report:

> The report indicates that [S.J.S.] was sucking on a pen at school and told a classmate that it feels good to have your privates sucked on. He said he learned it in a Garfield book but then stated it was from the Garfield 2 movie. The reporter spoke to [F.S.] about it and [S.J.S.] indicated that [Hineman] had told him. No specific information was given on if [Hineman] touched [S.J.S.] or forced [S.J.S.] to touch [Hineman].

*Id.* Hintz interviewed S.J.S.'s father and grandmother. *Id.* Hintz also coordinated a forensic interview of S.J.S., which took place at the Child Advocacy Center on August 4, 2015. *Id.* During the forensic interview, S.J.S. disclosed to the interviewer, Heather Jensen, that Hineman had touched him inappropriately. *Id.* Hintz interviewed Hineman the next day. *Id.*

3

On August 6, 2015, based on this investigation, Hineman was charged with first-degree sexual assault, sexual contact with a person under the age 13, contrary to Wis. Stat. § 948.02(1)(e). *Id.* ¶ 10.

Hineman filed a pretrial discovery demand for the State to disclose "[a]ll evidence and/or other information which would tend to negate the guilt of the defendant, including laboratory reports, hospital records or reports, police reports, or any other information within the state's possession, knowledge, or control." *Id.* ¶ 11. The State did not provide the March 12 CPS report, but it did provide Hintz's police report summarizing the CPS report. *Id.*

At trial, the State called four witnesses—Jensen, Hintz, S.J.S., and S.J.S.'s grandmother. *Id.* ¶ 12. The State played the video recording of S.J.S.'s forensic interview. *Id.* ¶ 13. During the interview, S.J.S. stated that Hineman touched his private parts over his clothes while the two of them were on the couch and S.J.S.'s parents were sleeping. *Id.* S.J.S. stated that Hineman laughed at him and S.J.S. woke his parents up and told them what happened, and his father kicked Hineman out. *Id.* S.J.S. told Jensen the incident occurred during the "wintertime" and while he initially stated that Hineman touched him four times, he later said it was six times. *Id.*

After the video was played, S.J.S. testified. *Id.* ¶ 14. He stated that he thought Hineman touched his private parts the day right after trick-or-treating and that nobody else was in the house at the time, but he told his father and grandmother about it the same day. *Id.* On cross-examination, S.J.S. testified that he told his father and grandmother about the

incident a few weeks after it happened. *Id.* S.J.S.'s grandmother later testified that no such disclosure took place. *Id.*

The State's final witness was Hintz. *Id.* ¶ 15. On cross-examination, defense counsel questioned her regarding when S.J.S. first disclosed that Hineman had touched him. *Id.* ¶ 16. The following exchange took place:

[Defense Counsel:] You first met with [F.S.] and [the grandmother] in July of 2015?

[Hintz:] Correct.

...

[Defense Counsel:] . . . There was no mention that [Hineman] had inappropriately touched [S.J.S.]?

[Hintz:] From [F.S.] no. There was not.

[Defense Counsel:] And there is no mention from [the grandmother] that there was a[n] allegation that [Hineman] had touched [S.J.S.]?

[Hintz:] No.

[Defense Counsel:] So the forensic interview of [S.J.S.] in August of 2015?

[Hintz:] In the beginning, correct.

[Defense Counsel:] And you were present for that?

[Hintz:] I was.

[Defense Counsel:] And is that the first time that [S.J.S.] says that [Hineman] touched his privates?

[Hintz:] I don't know if that's the first time [S.J.S.] had said that. I know that was the first time that I had seen that. But I believe in the CPS report, that there was a statement in

5

| | |
|---|---|
| | there that he said [Hineman] had done that. But I would have to look at the original report that came from CPS. |
| [Defense Counsel:] | Would that have been anywhere in your report if you -- if there was a mention that [Hineman] had inappropriately touched [S.J.S.]? |
| [Hintz:] | I don't know if I documented that. Whether or not I would have to look at my report again, in my original narrative to see if I did indeed write that in there. |
| [Defense Counsel:] | But if you were told that, you would have then put it in your report? |
| [Hintz:] | I would think I would have but it's not -- I might have not put it in there but that's why I would have to look at the report and look at the original CPS. I believe it does state that he later says that. |

*Id.* The defense called no witnesses except for Hineman, who described his relationship with S.J.S. and his family and how his communication with them changed after March 2015. Hineman denied sexually assaulting S.J.S. *Id.* ¶ 17. The jury found Hineman guilty of first-degree sexual assault of a child. *Id.* ¶ 18.

On March 1, 2019, Hineman filed a motion for postconviction relief and an order compelling postconviction discovery of the March 12 CPS report. *Id.* ¶ 19. Hineman argued the State suppressed material evidence favorable to his defense in violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* He further argued his attorney provided ineffective assistance by failing to obtain the CPS report before trial. *Id.* The circuit court granted Hineman's motion for postconviction discovery and recommended the release of all three CPS reports; however, the court denied Hineman's

6

motion for post-conviction relief, finding that the March 12 CPS report was not material under *Brady* because the information in Hintz's report corresponded to the information in the March 12 CPS report. *Id.* The circuit court further rejected Hineman's ineffective assistance of counsel claim. *Id.* ¶ 21.

Hineman appealed the circuit court's order, and the Wisconsin Court of Appeals reversed. (Answer, Ex. 6, *State v. Hineman*, 2020AP226 (Wis. Ct. App. Nov. 24, 2021), Docket # 24-6.) In so finding, the court of appeals determined that the State's failure to turn over the March 12 CPS report prior to trial violated Hineman's due process rights under *Brady*. (*Id.* ¶ 29.) The court of appeals found that Hintz's testimony on cross-examination mistakenly indicated to the jury that S.J.S. had disclosed "inappropriate touching" by Hineman to an adult as early as March. (*Id.* ¶ 39.) The court of appeals noted that after Hintz was asked whether the August 4, 2015 videotaped interview was the first time that S.J.S. states that Hineman touched his privates, Hintz testified that "I believe in the [March 12] CPS report, that there was a statement in there that he said [Hineman] had done that." (*Id.*) The court of appeals found that although Hintz indicated some uncertainty, the gist of her entire testimony on this point is summed up by her conclusion related to it: "I believe it does state that [S.J.S.] later says that." (*Id.*)

The court of appeals noted, however, that the March 12 CPS report does not contain such a statement and "[i]ndeed that report indicates the opposite as it states that the therapist reported 'that no information was given by [S.J.S.] that [Hineman] had touched him or forced [S.J.S.] to touch [Hineman],' and the closing portion of the report repeats

7

'[t]here has been no disclosure of maltreatment by the child.'" (*Id.*) The court of appeals found that defense counsel could not impeach Hintz with this error because the State had not provided the March 12 CPS report. (*Id.* ¶ 40.) The court of appeals concluded that Hintz's "erroneous testimony no doubt bolstered SJS's credibility and reliability in the eyes of the jury regarding his allegation of a sexual assault by Hineman" and disclosure of the report "would have allowed defense counsel to undo such bolstering." (*Id.*) The court of appeals remanded Hineman's case for a new trial. (*Id.* ¶ 52.) While Hineman raised an ineffective assistance of counsel claim before the court of appeals based on counsel's failure to file a motion to compel production of the March 12 CPS report (*see* Answer, Ex. 2, Docket # 24-2), the court of appeals did not address this argument.

The State petitioned the Wisconsin Supreme Court for review, which the court granted. *Hineman*, 2023 WI 1, ¶ 24. The Wisconsin Supreme Court reversed the court of appeals' finding, concluding that the March 12 CPS report was not material under *Brady*. *Id.* ¶ 33. The supreme court reasoned:

> The March 12 CPS report's use as impeachment evidence was not material because it fails to create a reasonable probability of a different result. The CPS report contains the same information as Investigator Hintz's police report except for the identity of the reporter, which is not material. The CPS report states, "Reporter indicated that no information was given by [S.J.S.] that [Hineman] had touched him or forced [S.J.S.] to touch [Hineman]." The police report states, "No specific information was given on if [Hineman] touched [S.J.S.] or forced [S.J.S.] to touch [Hineman]." The only difference between the two is that the CPS report includes, "by S.J.S." Regardless of this difference, both statements make the same point: At the time Investigator Hintz completed her report, she had no knowledge from any source that there was an allegation of touching. The police report provided defense counsel

> everything she needed to impeach Investigator Hintz's testimony that there
> was a prior allegation of touching.

*Id.* The supreme court further found that Hineman's counsel was not ineffective for failing to request the March 12 CPS report because any evidence derived from that request would have been cumulative; thus Hineman was not prejudiced for the alleged failure. *Id.* ¶ 45.

Hineman timely brought this instant petition for a writ of habeas corpus in federal court. (Docket # 1.) Hineman raises two grounds for relief in his habeas petition. First, he asserts that his due process rights under *Brady* were violated when the State wrongfully withheld the March 12 CPS report and second, he argues he received ineffective assistance of trial counsel when counsel failed to obtain the March 12 CPS report. (*Id.* at 6–8.)

## STANDARD OF REVIEW

Hineman's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a writ of habeas corpus may be granted if the state court decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000)

9

(quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).

To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565–66 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must

10

determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

## ANALYSIS

Although Hineman raises two grounds for relief—violations of his rights under *Brady* and *Strickland*—Hineman's ineffective assistance of trial counsel claim flows from the alleged *Brady* violation. Thus, I will begin with Hineman's alleged *Brady* claim.

Hineman argues that his due process rights were violated when the State withheld the March 12 CPS report, a document Hineman asserts was material and favorable to his defense, in violation of *Brady*. Under *Brady*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. *See also United States v. Wilson*, 481 F.3d 475, 480 (7th Cir. 2007). "The government has a duty to disclose evidence, regardless of whether the criminal defendant requests it, and that duty applies equally to impeachment and exculpatory evidence." *Ben-Yisrayl v. Buss*, 540 F.3d 542, 552 (7th Cir. 2008). For a *Brady* violation to exist, the defendant must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence is material to an issue at trial. *United States v. Stallworth*, 656 F.3d 721, 731 (7th Cir. 2011). "Suppression" occurs when "(1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *United States v. O'Hara*, 301 F.3d 563, 569 (7th

11

Cir. 2002). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Whether the "result of the proceeding would have been different" does not mean that a petitioner must demonstrate that disclosure of the suppressed evidence would have resulted in his acquittal. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Rather, the question is whether in the absence of the evidence, "he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

Throughout the litigation of Hineman's *Brady* claim in state court, the State never contested that the March 12 CPS report was favorable to Hineman's defense and that the State suppressed the report. *Hineman*, 2023 WI 1, ¶ 29. Thus, the parties only disputed *Brady*'s materiality prong. Likewise, the parties' focus before this Court is on the reasonableness of the Wisconsin Supreme Court's holding that the March 12 CPS report was not material under *Brady*. (Docket # 29 at 13–14.)

The Wisconsin Supreme Court correctly cites both the standard for finding a *Brady* violation and the standard for determining materiality under *Bagley*. Thus, the issue before me is whether the Wisconsin Supreme Court unreasonably applied *Brady* and *Bagley* to the facts of this case. The crux of the supreme court's holding is that if impeachment evidence is merely cumulative, then it has no reasonable probability of affecting the result of the trial and thus does not violate *Brady*. *Hineman*, 2023 WI 1, ¶ 31 (citing *United States v. Dweck*, 913

12

F.2d 365, 371 (7th Cir. 1990)). The supreme court found that impeachment evidence is cumulative when the witness could have been impeached at trial by the same kind of evidence. *Id.* And in this case, the supreme court concluded that the March 12 CPS report contained the same information as Hintz's police report except for the reporter's identity, which the court found immaterial. *Id.* ¶ 33. In so finding, the supreme court compared a specific sentence from each document. *Id.* First, the supreme court noted that the March 12 CPS report states as follows:

> "Reporter indicated that no information was given by [S.J.S.] that [Hineman] had touched him or forced [S.J.S.] to touch [Hineman]."

Then, the supreme court noted that Hintz's police report states as follows:

> "No specific information was given on if [Hineman] touched [S.J.S.] or forced [S.J.S.] to touch [Hineman]."

The supreme court concluded that the "only difference" between the two sentences is that the CPS report includes "by S.J.S." and regardless of the difference, both statements "make the same point: At the time Investigator Hintz completed her report, she had no knowledge from any source that there was an allegation of touching." *Id.* As such, the supreme court found that the police report "provided defense counsel everything she needed to impeach Investigator Hintz's testimony that there was a prior allegation of touching." *Id.*

Here lies the flaw in the supreme court's analysis. While the court identified *Brady*'s overarching materiality rule, it failed to correctly apply the materiality standard as outlined by the Supreme Court. The undisclosed evidence "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976). This involves considering:

13

"the overall strength of the prosecution case, the importance of the particular witness's credibility to the prosecution case, the strength of the concealed impeachment material, and how the concealed material compares to other attacks the defense was able to make on the witness's credibility." *Sims v. Hyatte*, 914 F.3d 1078, 1089 (7th Cir. 2019).

In comparing the statements from the CPS report and Hintz's police report and finding that both sentences make the same point, the court divorces the sentences from both the specific context of Hintz's testimony and from the trial as a whole. As in many cases of alleged sexual abuse, this trial turned on the credibility of the witnesses, principally S.J.S. and Hineman. There was no physical evidence to bolster S.J.S.'s claims, nor were there eyewitnesses to the alleged events. As the trial court judge stated at sentencing, the verdict "came down to credibility"—"[Hineman] against the child." (Docket # 24-19 at 24–25.) And even at that, the judge stated that "Frankly, I thought that the verdict could have gone either way." (*Id.*)

Indeed, the record evidence in this case was not particularly strong. S.J.S. was unable to recall many of the relevant events and when asked by the prosecutor whether his inability to remember was because he could not actually remember or because he simply did not want to talk about the events, S.J.S. responded that he could not remember. (Answer, Ex. 17, May 10, 2017 Jury Trial Transcript ("May 10 Tr.") at 47–49, Docket # 24-17.) And the information S.J.S. did remember contradicted his August 2015 forensic interview in multiple significant ways. During the forensic interview, S.J.S. stated that the touching occurred either four or six times and happened during wintertime, but not during the school

14

year. (*State v. Hineman*, 2020AP226 (Wis. Ct. App. Nov. 24, 2021), Docket # 24-6 at ¶¶ 9–10.) Whereas at trial, S.J.S. testified that Hineman touched him only once and that it occurred "the day right after trick-or-treating" in October 2014. (May 10 Tr. at 53.) Furthermore, on direct examination, S.J.S. testified that he told his grandmother and father about the touching incident the same day it happened (*id.* at 50), while on cross-examination he testified that he told his grandmother and father about the incident a few weeks after it happened (*id.* at 54–55). His grandmother, however, testified that S.J.S. never told her anything. (*Id.* at 67–68.)

Still, S.J.S. was nine-years-old at the time of trial and admitted that he was nervous to testify. (*Id.* at 44, 48.) Given S.J.S.'s lack of detail and contradictory information, the testimony of the remaining witnesses became more important to both fill in the gaps and to explain S.J.S.'s inconsistencies and lack of memory. The State elicited testimony from Jensen, the forensic examiner, regarding child abuse victims often engaging in "piecemeal disclosure" and "delayed disclosure." Jensen explained that "piecemeal disclosure" means the child will tell only "bits and pieces" of information at a time (*id.* at 28) and "delayed disclosure" means children will often not immediately disclose abuse (*id.* at 29). Jensen testified that research shows that about one-third of children disclose immediately after an incident occurs, one-third of children never disclose at all, and one-third of children delay disclosure. (*Id.*) Jensen testified that in her experience, however, the majority of children she worked with delayed disclosure. (*Id.* at 30.) Jensen explained that children will not

15

immediately disclose abuse for multiple reasons, including shame, embarrassment, fear, or lack of understanding that the action was wrong. (*Id.* at 29–30.)

The State further relied on S.J.S.'s grandmother's testimony and Hintz's testimony to establish a timeline of the alleged abuse. S.J.S.'s grandmother testified that her son, S.J.S.'s father, was hospitalized in October or November 2014 for approximately two weeks and that Hineman cared for S.J.S. overnight during this time. (*Id.* at 63.) She testified that Hineman took S.J.S. trick-or-treating that year. (*Id.* at 69.) S.J.S.'s grandmother further testified that S.J.S.'s behavior did not change immediately, but about three or four months later, S.J.S. began having difficulties both at home and at school, including "messing in his pants" and acting disrespectfully. (*Id.* at 64.)

It is in this context that defense counsel attempted to establish the timing of S.J.S.'s disclosure and the importance of the March 12 CPS report becomes clear. S.J.S. testified that the abuse occurred "the day right after trick-or-treating" in October 2014 and that he either immediately told his father and grandmother or told them a few weeks later. S.J.S.'s grandmother testified that S.J.S.'s behavior started to change three or four months later but that S.J.S. never told her about the abuse. Hintz testified that when interviewing S.J.S.'s father and grandmother in July 2015, they made no mention of Hineman's alleged abuse. This evidence supports S.J.S.'s family being unaware of the allegations against Hineman until the August 2015 forensic interview.

The jury was made aware, however, that a CPS investigation was initiated in March 2015 when CPS received a report that S.J.S. was observed sucking on a pen at school and

16

told a classmate that it feels good to have your privates sucked on. (*Id.* at 104–06.) The undisclosed CPS report injected uncertainty into the trial regarding whether S.J.S. accused Hineman of abuse as early as March 2015, a date coinciding approximately with when his grandmother testified that his behavior began to change. This uncertainty is compounded by Hintz's testimony that she believed the CPS report *did* contain an allegation of abuse against Hineman by S.J.S. and that she may have simply neglected to include this fact in her police report summarizing the CPS investigation. And the jury clearly wanted to know what precipitated the March 2015 CPS investigation, submitting the following question during deliberations: "How/when/who reported to CPS?" and noting the March 12 date:

> **Question or request:** How /when/who reported to CPS?
> *[handwritten annotations: March 12th? Teacher?]*

(Docket # 25-1 at 1.) The jurors were instructed in response to rely on their individual and collective recollections of the evidence as presented in court. (*Id.*)

Again, *Brady*'s materiality prong must be evaluated in the context of the entire record. Contrary to the Wisconsin Supreme Court's finding, Hintz's police report did not contain everything defense counsel needed to impeach Hintz's testimony. The State put on witnesses to explain and bolster S.J.S.'s inconsistent testimony. The State elicited testimony from Hintz that she believed CPS was investigating allegations that Hineman abused S.J.S. as early as March 2015, incidentally, coinciding with the timeframe S.J.S.'s grandmother testified S.J.S.'s behavior began to change. But the March 12 CPS report not only did not

17

contain any such allegations of abuse, it stated that: "There has been no disclosure of maltreatment by the child. Although the child's behavior has been concerning as of late, he is involved in therapy and the father is taking protective measures to ensure his safety." (Docket # 24-12 at 10.) Had defense counsel been provided with the March 12 CPS report, she could have impeached Hintz's testimony that S.J.S. accused Hineman of abuse as early as March 2015 and clarified that although S.J.S. was displaying some concerning behaviors, he made *no* disclosure of maltreatment by anyone. Thus, this report would have cut against the implication that S.J.S.'s change in behavior, occurring approximately three to four months after S.J.S. testified the abuse occurred (i.e., the day after trick-or-treating), was related to allegations of abuse S.J.S. made against Hineman as early as March 2015.

By divorcing the two statements found in the March 12 CPS report and the police report from the context of the trial as a whole, the Wisconsin Supreme Court unreasonably applied *Brady* and *Bagley*. The court failed to consider the overall weakness of the prosecution's case, the importance of Hintz's credibility to the prosecution's case given the weakness of S.J.S.'s testimony, and the strength of the concealed impeached material that not only contradicted Hintz's testimony, but affirmatively revealed that S.J.S. made *no* allegations of mistreatment in the March 12 CPS report. *See Sims*, 914 F.3d at 1089. Given the inconsistencies in the timeline presented by the State, the March 12 CPS report provided the strongest attack the defense could have made on Hintz's credibility. Hintz twice testified in response to defense counsel's questions that she "would have to look at the original report that came from CPS," to answer her question. (*See* May 10 Tr. at 107, 108.) But defense

18

counsel could not show Hintz the original CPS report because the government never provided it.

For these reasons, evaluating the March 12 CPS report in the context of the record as a whole, I find there was a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The Wisconsin Supreme Court unreasonably applied *Brady* and *Bagley* in determining otherwise. Hineman is entitled to habeas relief on this ground. *See Kyles*, 514 U.S. at 435 ("[O]nce a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review.").

While Hineman also argues that his trial counsel was ineffective for failing to file a motion to compel the government to turn over the March 12 CPS report prior to trial, because I find Hineman is entitled to habeas relief based on his *Brady* violation, I need not consider Hineman's claim for relief under *Strickland*.

## CONCLUSION

A defendant's due process rights are violated when the State withholds evidence that is both material and favorable to one's defense, as articulated by the Supreme Court in *Brady*. The Wisconsin Supreme Court's determination that the March 12 CPS report was not material under *Brady* unreasonably applies Supreme Court precedent. For these reasons, the writ must issue.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 1) be and hereby is **GRANTED**, and that petitioner be released within 120 days of the date of this decision unless the State of Wisconsin decides to retry him. The Clerk of Court shall enter judgment accordingly.

In the event the respondent files a timely notice of appeal, the judgment will be stayed pending disposition of that appeal.

Dated at Milwaukee, Wisconsin this 13th day of May, 2025.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge